Filed 3/28/25  In re A.M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARIA A.,<br><br>Defendant and Appellant. | F088433<br><br>(Super. Ct. Nos. 0087183-2, 0087183-3)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Amythest Freeman, Judge.

Amanda K. Moran, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Peña, Acting P. J., Meehan, J. and Snauffer, J.

Appellant Maria A. (mother) is the mother of twin seven-year-old daughters, A.M. and E.M. (collectively, the children), who are the subjects of this dependency case. Mother challenges the juvenile court's order issued at a Welfare and Institutions Code section 366.26[1] hearing that resulted in her parental rights being terminated. On appeal, mother contends the judgment terminating parental rights should be reversed because she was denied reasonable services during the reunification period. The Fresno County Department of Social Services (department) claims that this issue was addressed in mother's petition for extraordinary writ proceeding; and the doctrines of res judicata and law of the case bar mother from relitigating this issue. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. *Facts and Procedural Background Prior to Writ Proceeding*[2]**

**"Initial Removal**

"On June 14, 2022, the [department] received a suspected child abuse report that the children were exposed to domestic violence. An investigating social worker responded to a rural intersection to meet a deputy from the Fresno County Sheriff's Department. The deputy explained that a passerby had contacted law enforcement after mother and Juan R. (father)[3] were seen fighting in their vehicle. The children were found in the back seat of the vehicle when the deputy arrived at the intersection. The family was familiar to the deputy because he responded to their home several times, and there was currently a restraining order between mother and father. Father was arrested

---

**1** All further undesignated statutory references are to the Welfare and Institutions Code.

**2** The summary of facts and procedural history through the 12-month review hearing is derived from our previous opinion in this case (*Maria A. v. Superior Court of Fresno County* (June 10, 2024, F087643) [nonpub. opn.] (*Maria A.*).)

**3** "Father is not a party to this appeal."

for violating the restraining order, and he was transported to the Fresno County jail. [¶] … [¶]

"Later that day, the social worker visited the children at their foster home. A.M. did not want to speak with the social worker, but E.M. was willing to talk in the presence of her care providers. E.M. reported that she lived with her mother, father, and A.M. She stated that she never felt unsafe in her home, and she was not afraid of anyone in her home. E.M. denied that she was spanked, and she claimed to have a good relationship with mother and father. A.M. reportedly hit E.M. 'all the time,' but they were still friends.

"E.M. responded that father hit mother in the face when asked about the previous day. She was crying and telling her parents to stop during the incident. E.M. indicated that she was 'really scared,' and her parents would not stop fighting. She understood that father went to jail and mother went to see a doctor. E.M. stated that she wanted to stay with her care providers, and she did not want to go back home.

"On June 16, 2022, the department filed an original petition alleging the children were described by section 300, subdivision (b)(1). The allegations of the petition involved ongoing domestic violence between the parents and mother's untreated mental illness. The petition alleged that mother was driving carelessly without the children buckled. It further alleged that the parents were involved in a physical altercation in the presence of the children.

"The department filed a detention report on June 17, 2022, which set forth the above events surrounding removal. At a detention hearing held on June 17, 2022, the juvenile court ordered the children detained from mother and father's custody, and both parents were provided supervised visits with the children at least once per week for one hour. A combined jurisdiction and disposition hearing was set for July 28, 2022.

**"Jurisdiction and Disposition**

"The department's jurisdiction and disposition report dated July 22, 2022, recommended that the allegations in the original petition be found true and family reunification services be provided to mother and father. The children remained placed together in a family foster agency home, and no relatives were available for placement. An adult brother was willing to adopt the children, but he could not facilitate reunification because he lived in Los Angeles. Both children appeared to be developmentally on track at five years of age. A.M. had not had a seizure in over a year, but she was prescribed emergency seizure medication. Ongoing mental health treatment was recommended for A.M., but E.M. was not found to meet medical necessity for mental health treatment.

"The report detailed previous child welfare referrals involving the children. In October 2018, a referral alleged mother shook the children when she became upset, and the children fell from their crib due to a lack of supervision. The following year, a referral stated A.M. was seen at a hospital due to seizure activity and a burn-like mark. In September 2021, the department received a referral alleging mother was aggressive and appeared to be under the influence of a controlled substance. Each of the referrals was either deemed 'unfounded' or 'evaluated out.'

"On May 17, 2022, a referral alleged law enforcement responded to the family's home after father was arrested for domestic violence. There were also concerns for dirty conditions of the home and mother's mental health issues. The referral was 'evaluated out' because it was determined that mother 'appeared to be stable.' The next day, a referral stated that the children lived with relatives for an entire month while mother was in a mental health facility in April 2022. It was reported that mother was bipolar and c[ould] become aggressive. The referral was eventually substantiated due to the June 14, 2022 incident.

"A social worker contacted mother by phone on June 28, 2022. Mother explained that she needed a ride to attend her visit with the children, but the social worker responded that it would not be possible at that time. The social worker offered to provide a bus pass, but mother became upset and yelled profanities at the social worker. The phone call was terminated after mother was advised that continued yelling and cursing would end the phone call. The social worker then informed mother that the visit would be virtual because she had no transportation and there were no buses within her area of residence.

"On July 7, 2022, a maternal aunt, C.A., told the social worker that mother was recently hospitalized at a behavioral hospital. C.A. indicated that she did not know the details surrounding mother's hospitalization. The social worker reached mother by phone on July 11, 2022. Mother had been discharged from her hospitalization, and she was taking her medication. She explained that she was diagnosed with bipolar disorder, anxiety, and depression, and she was prescribed Abilify and Oxcarbazepine. [¶] … [¶]

"There were no concerns noted during mother's supervised virtual visit that occurred on June 28, 2022. A July 5, 2022 supervised virtual visit was cancelled after mother failed to join the visit. On July 11, 2022, a supervised virtual visit was terminated early because mother refused to comply with visitation guidelines. Mother was advised that she needed to speak in English for the supervised visit, but mother continued to speak to the children in Spanish and use profanities. The next day, mother argued with the visitation supervisor after she was advised that she could not make promises to see the children or have additional phone calls with the children.

"During a July 18, 2022 virtual visit, mother told the children that they should kick and hit dogs in the face if they are licked by them. The children were playing with building blocks during the visit, and mother promised that she would buy them building blocks. After mother was asked not to make promises to the children by the visitation supervisor, mother began shouting that she talks to the children this way, and she also

5.

used an expletive.  The visit was terminated after only 20 minutes due to mother's behavior.

"Mother's proposed case plan included the following objectives:  1) show your ability and willingness to have custody of your children; 2) comply with all orders of the court; 3) pay attention to and monitor your children's health, safety, and well-being; and 4) consistently, appropriately, and adequately parent your children.  Her recommended services included:  1) complete a mental health assessment and any recommended treatment; 2) complete a domestic violence assessment and any recommended treatment; 3) participate in an approved parenting program; 4) demonstrate her knowledge of age-appropriate behaviors, expectations and discipline techniques during her visits with the children; 5) complete a substance abuse evaluation and recommended treatment; and 6) participate in random drug testing.  Any missed drug tests would be considered a positive test result by the department.

"The department recommended that mother participate in a psychological evaluation to determine if she had a disabling mental disorder that would prevent her from benefitting from reunification services.  It was also recommended that mother participate in a risk assessment to determine the level of risk that the children would experience if returned to mother's care.

"At the jurisdiction and disposition hearing held on July 28, 2022, mother and father were both present and represented by counsel.  The juvenile court found the allegations in the original petition true, removed the children from the parents' custody, and ordered family reunification services for mother and father.  Both parents were ordered to participate in parenting classes, substance abuse, mental health and domestic violence evaluations and recommended treatment, and random drug testing.  Mother was ordered to participate in a psychological evaluation and risk assessment. Visitation was to be supervised once per week by the department, an approved third party, or an approved agency.  A six-month review hearing was set for January 26, 2023.

**"Six-Month Review Period**

"In its report for the six-month review hearing dated January 20, 2023, the department recommended the juvenile court continue family reunification services for mother and father. Both parents were living together, and there were no active restraining orders between them. The children remained placed in the same foster home, and they felt safe and comfortable in the placement. Both children expressed their desire to return to their parents' care, but they also reported being afraid because of the constant fighting between their parents. They had witnessed their mother bleed after father put his hand over her face. The children also stated that mother fought with 'everyone,' including people at the store, school, and neighborhood.

"A.M. was taken off of her seizure medication, and it was determined that she had likely outgrown her seizure risk. Both children were developing on track and enrolled in kindergarten through a homeschool based charter school. A.M. began mental health treatment in August 2022, and she was learning coping skills. The care providers explained that A.M. had a difficult time opening up to the therapist, but she enjoyed participating in play therapy. E.M. completed a second mental health assessment in October 2022, and she was found to meet medical necessity for services. E.M. participated in weekly therapy sessions, and a case manager provided her with emotional behavior support. [¶] … [¶]

"Mother completed her parenting class on October 19, 2022. She learned that hitting the children was not a solution, and she was taught about the importance of communicating with the children. In October 2022, mother began an online child abuse intervention program according to the recommendation of her domestic violence assessment. Mother's program was placed on a hold in November 2022 due to consecutive missed classes. An intake appointment was scheduled for January 23, 2023, to allow mother to reenroll in the child abuse intervention program.

"Initially, mother refused to sign a release of information to allow the department to obtain information from her ongoing mental health provider. Mother was reportedly participating in weekly therapy, and she declined to participate in mental health services through the department. She provided proof of attendance for four different dates in July and August 2022, but the department did not receive any information on her treatment goals, diagnoses, or psychiatric services. On January 17, 2023, mother indicated that she would be signing a release of information for her mental health provider, but confirmation was not made at the time of the report. The social worker referred mother for a psychological evaluation in August 2022, and mother was on the waitlist at the time of the report. [¶] … [¶]

"During the six-month review period, the parents were transitioned from supervision being provided by the department to an agency for intensive supervised visits. On July 25, 2022, mother shouted at the department's visitation supervisor because she was admonished to speak English to the children during the supervised visit. The parents were referred to an agency for intensive supervised visits on August 5, 2022. At a virtual visit on August 8, 2022, mother became angry when one of the children referred to their care provider as 'mom,' and mother shouted that she should not call the care providers 'mom' or 'dad.' Later in the same visit, mother shouted that the children were disgusting for walking barefoot in the care providers' home while dogs were inside. The department's visitation supervisor ended the visit because mother was shouting, cursing, and speaking in an aggressive tone towards the children.

"According to visitation narrative forms prepared by the parents' visitation coach, intensive supervised visits began on August 19, 2022. Overall, the visitation notes indicated that the parents kept the children engaged and were verbally affectionate, but the parents were often admonished for failing to follow guidelines and set boundaries.

"On August 26, 2022, the visitation coach reminded the parents to follow guidelines and not discuss future visits or living arrangements at the outset of a virtual

8.

visit. During the visit, the parents began to discuss the date that the children would return home, and mother told the children that they would return home in six days. The visitation coach attempted to redirect the parents, but both parents began using inappropriate language toward the coach. The coach ended the virtual visit due to the parents' violation of visitation guidelines.

"At a two-hour in-person visit on September 16, 2022, both parents were present and provided snacks for the children. The visitation coach turned on a show for the family while they were sitting together on a couch. A.M. nodded in the affirmative after mother asked if she was doing alright. Afterwards, E.M. told mother that she talked about mother and father with her therapist. E.M. initially stated that she could not talk about what she told the therapist because it was ' "bad." ' However, mother inquired further, and she stated, ' "[i]t is you and daddy fighting. Do you still fight?" ' Mother hugged and kissed E.M., and the visit continued.

"The children told the parents that they were sad because they wanted to return home during a virtual visit on October 7, 2022. The parents comforted the children and explained that they would bring their favorite snacks to the next visit. The next week, the children ate snacks and watched a movie with the parents. E.M. began to cry at the end of the visit, and both children stated that they wanted to go home. On October 21, 2022, mother denied that she still fought at home when E.M. asked her. The visitation coach noted that both parents had learned to follow intensive supervised visitation guidelines by the end of October 2022.

"On November 4, 2022, A.M. did not wish to participate in the visit with her parents and E.M. due to a stomachache. The visitation coach asked A.M. if she wanted to join the visit for a small amount of time, but A.M. took a step back and declined. Father acknowledged that A.M. told him that she had a stomachache the previous week. E.M. participated in the visit by eating snacks, watching a movie, and playing cornhole. A.M. apologized to her parents for missing their time during the next visit.

"During a makeup visit on December 15, 2022, E.M. told mother that the children were not allowed to sit on their parents' laps or go to the restroom with them. During the visit, mother took the children to the restroom and visitation staff suggested that E.M. go into the restroom stall by herself. The family watched a movie together, and visitation staff told the children that they could sit on their parents' laps.

"On December 23, 2022, and December 30, 2022, the children informed visitation staff that they did not want to go in to their scheduled visit with the parents. Each time, they expressed a desire to see their parents the following week instead. Mother became agitated after the children declined to attend a January 6, 2023 visit. The children were advised that they would not be alone with their parents, but they continued to refuse.

"Arrangements were made to have a virtual visit on January 13, 2022, but the children still refused to participate. The visitation supervisor inquired if both children would attend a visit the following week to watch movies and have snacks. Both children agreed to attend. However, A.M. only agreed because she was scared, and E.M. still wanted to think about it. The visitation center indicated that the referral for intensive supervised visits would be closed due to a fourth refusal.

"The social worker's assessment for the review report stated that the parents' visitation did not progress because of their lack of compliance with the case plan. In addition, the children refused to participate in visits because they did not wish to return to their parents' care, and they did not want to be tricked into returning to their parents. The children also reported that they were afraid to return to their parents' care because of their fighting. The social worker advised that visitations would be supervised and they would return to the care providers after the visit, but they continued to state that they would not visit. The children were told to contact the social worker if they wanted to visit with their parents.

"At the six-month review hearing held on January 26, 2023, both parents were present and represented by counsel. After submitting on the department's

10.

recommendation, mother's counsel requested 'either video, telephonic, … [a]nd maybe even separate visits,' to address any fear that an argument would break out during the parents' visitation. Her counsel also indicated that mother was willing to separate from father, if necessary, to have the children returned. In response, counsel for the department suggested that the juvenile court could order that 'intensive supervised therapeutic visits' be provided again. Mother's counsel then agreed with the department's offer to coordinate intensive supervised visits.

"The juvenile court adopted the department's recommendation to continue family reunification services, and it also found that reasonable services were provided to aid the parents in overcoming the problems that led to the children's removal. The previous visitation orders were modified to allow 'therapeutic intensive visits,' and the department was provided with the discretion to determine if visits should be separate for the parents. The 12-month review hearing was set for July 11, 2023.

**"Twelve-Month Review Period**

" The children refused to attend scheduled visitations with their parents for most of the 12-month reporting period. The social worker arranged a virtual visit between the children and parents on February 10, 2023. A.M. began crying during the visit, and she left the video screen. E.M. smiled and interacted with the parents during the virtual visit. E.M. told her parents that A.M. was crying because she missed them. Later in the visit, A.M. reappeared for a moment while she was still crying.

"The following week, the social worker supervised another virtual visit between E.M. and the parents. A.M. did not participate in the visit, and mother stated that it was 'ok' that she did not join. The social worker redirected mother when she told E.M. that the children would be home in a couple of months. Mother informed E.M. that she did not fight anymore, and she shared that she was taking her medication now.

"On February 23, 2023, the social worker supervised an in-person visit between E.M. and the parents. A.M. was encouraged to join in the visit, but she declined to

participate. The parents brought pizza, cake, and candy for E.M. to celebrate father's upcoming birthday. During the visit, mother asked the social worker if she could provide cell phones to the children because she wanted to make sure that the care providers were telling the children that they were in the care provider's home temporarily. The social worker admonished mother to focus on the visit.

"Another in-person supervised visit took place between the parents and E.M. on March 2, 2023. A.M. indicated that she did not want to participate even though the social worker would be present and supervising the visit. Mother became confrontational with the social worker after she observed that E.M. was the only child present. Mother continued to state that the children were coming home, and she wanted the care providers to understand. The social worker informed mother that this was not an appropriate place to discuss the issue because E.M. was present, but mother continued to discuss her concern that A.M. was not present.

"In the visitation room, mother began to ask if E.M. told her sister about the things she does with her parents during visits. The social worker redirected mother to focus on the visit when mother asked about topics she would like to discuss during an upcoming meeting. Mother stated that the social worker was always rude, and E.M. looked to mother for a reaction during a subsequent admonishment from the social worker.

"On March 10, 2023, an intensive supervised visit was scheduled for the parents and children, and the previous visitation coach was present to supervise the visit. The children were brought to the agency, but they both told the visitation coach that they did not want to attend the visit. The parents asked if they had other options to speak to the children, and mother wished that she knew why her children refused the visit.

"The social worker arranged separate visitations for each parent and the children on March 24, 2023. The children refused to participate in either visit. According to the care provider, the children had a tough week after a visit took place the previous week. The social worker noted that one of the children believed mother was lying about being

better than she was before.  The visitation coach encouraged mother to hold off on bringing toys and focus on talking about the children's feelings.  Mother indicated that she was looking to have family therapy with the children, and she would bring notebooks to the visits to discuss their feelings.

"The following week, the children refused to attend their intensive supervised visit with either parent.  The visitation coach explained that they would visit each parent separately and return to the care provider afterwards, but the children still chose not to participate.

"On April 3, 2023, mother's counsel filed a section 388 petition requesting that the juvenile court order that the children be 'mandated' to attend visits.  As changed circumstances, the petition stated that mother completed all of her family reunification services.  The request was alleged to be in the children's best interests because it would allow the children to reunify with mother.  The court denied the request without a hearing due to a lack of changed circumstances or new evidence.

"On April 7, 2023, the children indicated that they did not want to visit because they did not want to go home with either parent.  The visitation referral at the agency providing intensive supervision was closed due to three consecutive refusals by the children.

"Attempts were made by the social worker to supervise virtual visits between the parents and children on April 14, 2023, and April 21, 2023.  The social worker explained to the children that the visits would be online, but they still declined to participate.  The department was unable to refer the parents to an agency for visitation because the children were refusing, and the cancelled visits would take spots from other families who were on the waiting list.

"The social worker agreed to allow the parents to send a video of themselves to the children in an attempt to encourage them to visit.  On April 28, 2023, the social worker asked the children about their thoughts on the video and desire to visit.  Both

children continued to state that they did not want to see their parents. Mother's mental health case manager had agreed to supervise a visit, but the visit had to be cancelled because the case manager's supervisor did not give her approval.

"The children's counsel submitted a report from its investigator, which documented interviews of the children and their care providers on May 2, 2023. The care providers informed the investigator that the children had not engaged in any visits since March 17, 2023. A.M. agreed to participate in that visit after E.M. told her about how much fun a previous visit was. The children displayed no concerning behaviors prior to the visit. A.M. cried for the first five minutes of the visit, and father told A.M. that the parents no longer fought with each other. During the night following the visit, A.M. began crying and stating that she believed father was lying about the parents no longer fighting. A.M. reportedly cried at random during the following week.

"The children's care providers also described an occasion where A.M. started to cry while they were driving in the car. A.M. asked if the care providers were taking her back to the parents' home while she was crying in the car. A.M. became calm once the care providers explained that they were driving to a store. Later that same day, A.M. screamed when the front door opened because she thought her parents were coming to take her home. There were also incidents where A.M. would urinate in her bed or have nightmares prior to visits with her parents. The children had informed the care providers that they did not wish to return to their parents' care because they believed the parents would continue to fight with each other.

"At the start of A.M.'s interview, the investigator determined that A.M. knew the difference between the truth and a lie. A.M. explained that she felt 'really safe' with the care providers because there was ' "no one fighting" ' in the home. Even though her last visit with father went well, she believed that father lied to her and E.M. about the parents no longer fighting. A.M. stated that she no longer wished to visit because she believed the parents would continue to fight with each other.

14.

"The investigator asked A.M. about her reasoning for not wishing to have phone or virtual visits, and A.M. responded that she did not want to see her parents anymore. A.M. wished to remain placed with her current care providers, but she believed that she and E.M. may return to the parents in the future. In the event that A.M. was returned home, she expressed that she would feel sad. A.M. denied that any person had instructed her on what to say regarding her wishes to visit with her parents.

"The investigator also spoke separately to E.M., and it was determined that E.M. also knew the difference between the truth and a lie. E.M. shared that she did not wish to have further visits with her parents because she did not want to return home. She was afraid that her ' "mommy and daddy" ' would fight again, and she also described how she previously witnessed mother fight one of father's friends. E.M. explained that she did not like people fighting with each other because it made her sad. She also denied that any persons instructed her about how to respond regarding her desire to visit with her parents.

"On May 19, 2023, the social worker attempted to coordinate a visit between the parents and children at a park. A third party had been cleared to supervise the visit. The social worker arrived at the visit to find the third-party supervisor and mother standing by the care providers' vehicle and asking the children why they did not want to visit. Both children quickly responded that they did not want to visit with their parents when asked by the social worker. The children also refused the social worker's offer to play on the playground.

"Mother asked the children if they could try again next week. A.M. responded, ' "I'm not doing visits anymore," ' and E.M. shook her head in disagreement. Next, the children were asked to provide a reason for their refusal by mother. A.M. told mother, ' "because I don't want to go home." ' Mother asked the children why they did not want to return home, and A.M. explained that she was scared. The social worker advised that mother should stop making the children feel like they were being interrogated, and the care provider was given permission to leave with the children.

"Mother indicated that she wanted her therapist to speak to the children's therapist because mother believed the social worker and care providers were telling the children to refuse visits. Additional attempts were made by the social worker to encourage the children to visit on May 23, 2023, and June 9, 2023. The social worker informed the children that they could see their parents anytime, but the children continued to state that they did not want to visit with their parents.

"The department's report for the 12-month review hearing dated June 23, 2023, recommended termination of mother and father's family reunification services. Mother and father were still living together, and they hoped to get through the case together. The children remained placed together in the home of the same foster family. There were no significant medical or developmental concerns for either of the children. Both children were participating in individual therapy with separate clinicians, and they also had group therapy as siblings.

"A.M. began working with a new mental health clinician, Amanda L., in April 2023. Amanda noted that A.M. had behavior and attachment issues, and she was having difficulty separating from the care provider. The care provider noted that A.M. continued to have difficulties opening up to the clinician, but she appeared to be able to express her feelings well to the care provider and social worker.

"E.M.'s mental health clinician, G.F., stated that E.M. was always engaged in her sessions, and she talked about the domestic violence between her parents on occasion. On May 15, 2023, the social worker asked both children's clinicians if they would recommend family therapy with their parents, and the clinicians responded that they did not believe the children were ready for family therapy.

"Mother was participating in individual therapy with mental health clinician L.L. once per month. Her clinician provided the social worker with an update by phone in June 2023. According to the clinician, mother was attending consistently, and she was

16.

working on managing her emotions with coping skills. Mother also participated in group therapy once per month where she worked on arts and crafts.

"In June 2023, mother completed another substance abuse assessment, and she did not meet medical necessity for treatment. Her last random drug test was a negative result in February 2023, and she had not been requested to test since that date. As of June 13, 2023, mother had completed 16 sessions of her child abuse intervention program. Mother was fifth on the waitlist for a psychological evaluation at the time of the report.

"During the review period, father participated in his substance abuse program, but he missed one or two sessions each week due to his work schedule. He also missed several drug tests and tested positive for alcohol on five occasions. On June 6, 2023, father completed the 12-week anger management program that was ordered through his criminal case.

**"Twelve-Month Review Hearing**

"At the 12-month review hearing held on July 11, 2023, the children's counsel requested that the juvenile court order the children's therapists to provide a letter detailing whether intensive supervised visitation or conjoint therapy with the parents was therapeutically recommended. Any patient privilege regarding that specific assessment would be waived by the children's counsel. Mother's counsel requested that a child psychiatrist from mother's mental health provider be allowed to either 'collaborate' with the children's therapists or have access to the children in order to prepare his own report.

"Both parents requested a contested hearing, which was set for August 29, 2023. The juvenile court noted that it only wanted to hear from the children's therapists, but it would be open to additional referrals in the future. Each of the children's therapists was ordered to provide a letter explaining why they are not recommending that the children participate in intensive supervised visits or conjoint therapy with the parents as well as the basis for that opinion.

17.

"The department submitted an addendum report on August 11, 2023, which included a letter from each of the children's mental health clinicians and their clinical supervisor. The letter provided a summary of the children's treatment and a recommendation for future mental health services. Both children were assessed for mental health services on July 11, 2022. The assessment provided diagnoses of posttraumatic stress disorder and disinhibited social engagement disorder for both children.

"E.M.'s current clinician, G.F., had been providing her with individual therapy since December 2022. E.M.'s initial symptoms included nightmares, reenactments of trauma during play, feelings of guilt and fear, social withdrawal, difficulty concentrating, difficulty sleeping, over-familiarity with adults, willingness to leave with unfamiliar adults, and reduced reticence in interacting with unfamiliar adults. A.M.'s current clinician, Amanda, had been providing individual therapy since April 2023. A.M.'s initial symptoms included spontaneous intrusive memories regarding witnessing domestic violence, socially withdrawn, irritability, angry outbursts, easily attaching to adult figures, absence of reticence when approaching unfamiliar adults, and overly familiar verbal or physical behaviors with adults.

"The letter concluded that the children were not ready to begin family therapy due to their history of trauma and impairment. The clinicians' plan was to continue to prepare the children for family therapy, however, it was not in the children's best interests to begin family therapy at that time.

"On August 29, 2023, the children's counsel requested a continuance of the contested hearing to allow additional time for the children's clinicians to explore the possibility of family therapy between the children and parents. The juvenile court acknowledged that it had previously ordered that the children participate in therapeutic visits. However, it ordered that the children should not be forced to attend visits, and

anyone putting undue stress on the children would not be viewed favorably by the court. Without objection from the parties, the court continued the hearing to November 2, 2023.

"In an addendum report dated October 30, 2023, the department provided additional information on its attempts to encourage visitation between the parents and children. The social worker indicated that the children were asked weekly about their willingness to visit with their parents since April 2023, but the children continued to refuse any type of visitation. The report also detailed several positive test results for alcohol from father's random drug testing. Father explained that he drank beer after work, and he did not see any problems with his alcohol use.

"After the previous hearing, the social worker asked the children's clinicians if they could observe an in-person visit. The clinicians explained that observing the visit could damage the therapeutic relationship between the children and clinicians. The department and children's clinicians put together a plan to start family therapy when the children were ready to start visitation. The report also noted that the visits that were cancelled at the agency due to the children refusing were considered '[t]herapeutic [i]ntensive visits.'

"On September 8, 2023, a mental health provider sent the social worker a family case plan for the children and parents with a goal to engage all of them in family therapy. The services would be provided weekly for both parents and children once all parties were ready to participate in family therapy.

"There was some progress toward family therapy according to a September 20, 2023 update from the children's clinicians. A.M. declined to paint a picture for her parents, but she was willing to view the pictures that her parents drew. E.M. requested to write a letter for her parents without prompting during her session. The letter to her parents indicated that she wanted to stay in the care provider's home. E.M. also shared stories about the parents fighting, father grabbing mother's face, and father going to jail.

19.

"Both clinicians continued to work on building a bond and working through any fears the children had about seeing their parents. The clinicians were also able to have sessions with each parent by providing psychoeducation on the effects of trauma on young children. Mother was updated on the progress toward family therapy, and the clinician believed mother was developing an understanding of the need for a slow pace towards family therapy.

"During a monthly contact on October 2, 2023, the social worker had the children express themselves through an activity by drawing three different houses: house of dreams, house of good things, and house of worries. Both children drew the care providers and their foster siblings in their house of dreams. Both parents were drawn in each child's house of worries. A.M. explained that mother was hitting father in the face, and she was worried that her parents would hit each other if she had to go back home. E.M. stated that she worried that her parents would fight if she went back home, and she began to tear up.

"A child and family team meeting took place on October 10, 2023, to discuss progress towards family therapy. Amanda stated that A.M. experienced increased sadness during therapy and at the care providers' home. Amanda was working with mother since the previous month to pace her with therapy for the children and provide updates on progress. G.F. explained that E.M. was encouraged to try family therapy, but E.M. refused to see her parents. The clinical supervisor reported that both clinicians were doing well with encouraging the children to try family therapy, but the process could not be pushed to happen sooner. The social worker had noticed that A.M. was tearful and fearful during monthly contacts, and A.M. had to be reminded that the social worker was not there to take her home.

"The children's counsel submitted an additional report from its investigator on October 31, 2023. The care providers told the investigator that A.M. cried multiple times per day as a result of her fear that she would return to the parents' care. A.M. was also

20.

becoming more aggressive by hitting E.M. and her foster siblings.  E.M. stated that she no longer wished to have visits with her parents because she was close to being returned to her parents' care, and she did not want to return to her parents.  E.M. expressed her understanding that her parents were participating in services to allow the children to return home, but she indicated that she would not feel safe in her parents' care.  A.M. reiterated her previous statements that she did not want to visit or return to the parents because she was afraid of their fighting.

"The contested hearing was continued to November 16, 2023, due to the unavailability of a Spanish interpreter.  An additional continuance was granted after a conflict resulted in father being appointed new counsel.  At a January 9, 2024 settlement conference, the matter was confirmed for a contested hearing to be held on January 23, 2024.  The next day, new counsel filed a substitution of attorney on mother's behalf to replace her court-appointed counsel.

"The department prepared a third addendum report dated January 17, 2024, which incorporated mother's psychological evaluation and risk assessment.  The recommendation for the review hearing remained the same, and its assessment stated that mother had not benefitted from her programs.  Mother had completed a parenting program, and she was still participating in a child abuse program.

"The children continued to refuse visits with their parents despite the social worker's repeated efforts to coordinate visits in the months leading up to the contested review hearing.  Mother had regular meetings with A.M.'s clinician to receive psychoeducation regarding the effects of trauma in children and how she may rebuild the parent-child relationship in the future.  Mother provided letters, photos, and positive memories in an attempt to bond with the children.

"The children were attending individual therapy weekly, but E.M. refused to attend a session in November 2023.  A.M. was willing to keep a toy that mother provided for her, but she refused all other items from mother.  E.M. refused to take any items,

letters, or paintings that mother provided for her. Both of the children's clinicians attempted to offer the children a brief visit where they could play a game with their parents with them present, but the children still refused to meet with either of their parents. The children's display of increased sadness, irritability, and aggressiveness both at the care providers' home and during sessions resulted in a temporary hold on offering the children items from their parents. The subject of family therapy would be pursued once symptoms decreased, and conjoint sessions between both children would be assessed.

"Dr. Alexander Johnson, a licensed psychologist, completed a report for mother's psychological evaluation and risk assessment on November 29, 2023. The report described a clinical interview between mother and Johnson that took place on September 25, 2023. Mother explained how her parents separated due to domestic violence perpetrated by her father, and she recalled witnessing her father physically abuse her mother several times as a child. On one occasion, mother intervened in a fight by hitting her father with a pot of boiling beans because she feared that her father was going to kill her mother.

"Mother indicated that the domestic violence aspects of her relationship with father began one year prior to the children's removal. The parents were participating in couples' therapy, but she did not offer any perceived growth or benefit from therapy. In total, mother estimated that she had been placed under a psychiatric hold pursuant to section 5150 approximately eight to 10 times since 2003. Her current psychiatric treatment included weekly therapy and psychiatric medication. At least one of her psychiatric hospitalizations was related to her history of medication noncompliance.

"Johnson inquired about mother's understanding of the children's refusal of visits, and mother responded, ' "if the care providers had been talking good about it there's no reason why they wouldn't want to be visiting with us." ' It was noted that mother made an effort to minimize her current life stressors during the assessment. The report

concluded with a diagnostic impression of 'Bipolar I Disorder, Unspecified,' which mother had been previously diagnosed with.  Her disorder did not appear to be disabling because she was medication and treatment compliant at the time of the assessment.

"Bipolar I disorder was described as a mental health condition that does not typically resolve spontaneously, and most individuals who are diagnosed with bipolar I disorder require medication interventions to manage their manic and depressive episodes across their life span.  Due to mother's past disregard for her medication treatment, Johnson opined that her 'currently tenuous medication compliance' was a point of concern that would likely impair her ability to parent.  A remedy for this concern was for mother to demonstrate medication compliance and engagement with therapy treatment for a sustained period of time of no less than nine months.

"Based upon the totality of the evidence in the report, Johnson concluded that there was a moderate risk of the children being physically, sexually, and/or emotionally abused by mother if they were allowed to visit or return home.  Mother continued to lack awareness of her role in the children's refusal to visit, and she did not take responsibility for her own behaviors that created tension in their relationship.  During the assessment, mother verbalized her continued belief that the children did not visit with her because they were being improperly counseled by their current care providers.

"Johnson recommended that the children be allowed to decline or terminate visitation at any time due to the 'clear schism that has arisen between [mother] and her children ….'  Supervised in-person visitation could be appropriate once the children were willing to consistently engage in visitation with mother.

"After a final continuance at the request of mother's new counsel, a contested 12-month review hearing began on February 8, 2024.  The contested hearing started with testimony from mother's mental health case manager, N.G.  Mother became a patient of N.G.'s after she was elevated to a higher level of care in November 2022.  N.G. provided

coaching, education, and support for her assigned patients, but she resigned from the mental health provider in January 2024.

"During N.G.'s initial contacts with mother, she noticed that mother was agitated, crying, and unable to control herself. After several months, mother began taking her time to breathe and calm herself down. N.G. testified that mother was engaged in her services and maintained her appointments throughout the previous year. Mother told N.G. about her belief that the care providers were telling the children to not participate in visits. There were also occasions that mother expressed her lack of understanding about the reasons the children stopped visiting with her.

"The social worker's supervisor, Abigail M., testified that the children's case was assigned to her unit in March 2023. Abigail had reviewed the reports that were prepared for the review hearings, and she acknowledged that mother was participating in her court-ordered services. Conjoint family counseling had been part of the case plan, but Abigail was not aware of any specific order for mother to participate in conjoint family counseling.

"The children were refusing visits at the time that Abigail was supervising the children's case, and she had conversations with the assigned social worker about ways to get the children to participate in visits. In situations where children refuse to visit, the department consults with treating clinicians and attempts family therapy. Family therapy was delayed between mother and the children because the department was consulting with the treating clinicians.

"In her 25 years of experience with the department, Abigail had observed children begin to refuse visits after past participation. She believed such refusals could be based upon a sense of not feeling safe and remembering past trauma. Children may begin to remember past trauma from removal while participating in therapy, which may cause them to refuse visits with a parent.

"The children continued to participate in therapy, and their clinicians did not believe that either of them were ready for visitation or family therapy. The children's clinicians expressed that the children were not ready because they had not processed their trauma. The department was not aware of any evidence that the children were coached to refuse visits after inquiring of the care providers and the children's clinicians. It was the department's position that additional trauma would be inflicted if the children were forced to participate in visits with their parents, and a social worker is unable to physically force a child to attend a visit.

"The parents indicated that they were living in separate residences, but father also stated that he would move back into the home if the children returned to mother's care. Abigail testified that visitations appeared to be detrimental to the children's well-being. Mother had completed a parenting program, and she continued to participate in a child abuse program and therapy. However, mother reportedly made statements that she did not believe that domestic violence had any impact on her children.

"Mother testified on her own behalf. She described the children as loving and playful, and the children had a '[v]ery good' relationship with each other. Prior to the children's removal, father worked for 10 hours each day while mother took care of the children. Mother testified that her mental health was poor on the date of the children's removal, and she indicated that she was not sleeping well due to prescription medications. Mother also acknowledged that the children were traumatized by mother's mental health episode and arguments between the parents. She denied ever using any physical discipline on the children.

"Her hospitalization for three days pursuant to section 5150 was her third hospital stint in 2022. Mother testified that she was devastated when she returned home to find that the children had been removed. She was emotional during her first virtual visit after the removal, and the children and mother told each other 'I love you.' At their

first in-person visit, the children were happy during the visit, but mother observed the children to be sad at the end of the visit.

"Mother felt the children began to act differently during a visit in December 2022. She testified that the children reported being told not to sit on the parents' laps by the care providers. The children appeared hesitant to get close to the parents, but A.M. still gave mother a kiss at the end of the visit. The first declined visit occurred just before Christmas, and mother did not know why the children did not attend. At an attempted visit in a park, mother told the children that she loved them, and E.M. reportedly responded, 'I love you more.'

"Mother was previously connected with a mental health provider, but she was not engaged in therapy until after the children's removal. She testified that therapy taught her how to manage her depression and anxiety. Her parenting class taught her how to discipline and set boundaries with the children. She was still attending a 52-week child abuse program, which taught her about the effects of trauma on children. A psychiatrist prescribed two medications to treat mother's mental health issues, which she identified as Wellbutrin and Trileptal. She attributed two of her past hospitalizations to interactions between her medication that interfered with her sleep.

"Mother desired to participate in counseling with the children, and the social worker provided her with information about potentially participating in counseling due to the refused visits. However, she was never able to participate in any counseling with the children during the case. Mother testified that she was no longer living with father. She did not intend to get back together with father because their relationship had 'a lot of arguing,' and she was disappointed in his positive drug test results. Mother was informed that the children refused to visit due to the parents excessive arguing. Mother testified that she and father never argued during any of their visits with the children. Mother did not believe that she ever had the opportunity to … prove to the children that she would no longer expose them to fighting.

26.

"On cross-examination, mother acknowledged that she and father had physical altercations in the presence of the children on more than one occasion. She understood that the department scheduled her for 'therapeutic or intensive supervised visits' after it was reported that staff did not feel safe with mother's behavior at the previous visitation facility. Mother denied that she ever yelled at social workers, but she admitted to disagreeing with the social worker and raising her voice on occasion. She also testified that she did not believe the care providers were coaching the children, but she felt that they were not motivating them to visit. Mother never observed any physical reactions in the children to suggest they were afraid of her during visits.

"Father testified that he completed a parenting class and anger management program. He stated that he would complete his substance abuse program if his reunification services were continued. Father was not aware of the reasons that the children refused visits, but he hoped to have the opportunity to reunify with the children.

"The next day, the contested hearing continued with closing arguments from the parties. Counsel for the department argued that it met its burden of proof that it would be detrimental to return the children to the parents' care. It also asserted that the department had shown by clear and convincing evidence that reasonable services were provided. Counsel for the children agreed with the department's position. She asserted that there would be an emotional detriment to the children if returned home with citation to the case of *In re Joseph B.* (1996) 42 Cal.App.4th 890 ….

"Mother's counsel argued that mother did not pose a risk to the children because she was living separately from father and had benefited from her services. Both mother and father's counsel claimed that the department failed to provide reasonable services.

"After hearing argument from all counsel, the juvenile court continued the hearing for a ruling on February 16, 2024. In its ruling, the court acknowledged that both parents had likely made moderate progress in reaching their goals. However, it reasoned that the focus of its inquiry should be on the emotional well-being of the children even when the

27.

parents had been compliant with services.  The court also indicated that conjoint therapy with the parents would be detrimental to the children.

"The juvenile court ultimately found that return of the children to mother would create a substantial risk of detriment to the children, and it also found that the department provided reasonable services.  Both parents family reunification services were terminated, and a section 366.26 hearing was scheduled for June 11, 2024."

**B.     *Facts and Procedural Background After Writ Proceeding Commenced Extraordinary Writ Petition***

Mother filed a petition for extraordinary writ relief seeking review of the juvenile court order setting the section 366.26 hearing.  (*Maria A.*, *supra*, F087643.)  In her petition, mother asserted insufficient evidence supported the juvenile court's finding that: 1) return of the children to her custody would create a substantial risk of detriment; and 2) reasonable services were provided.  Specifically, mother argued that the department failed to provide reasonable services because conjoint family therapy was required under the circumstances.  In our opinion filed June 10, 2024, we rejected mother's claim that reasonable services were not provided, and we affirmed the juvenile court's orders.

*Section 366.26 Hearing*

The department's section 366.26 report, dated June 6, 2024, recommended the juvenile court terminate the parental rights of mother and father and order a permanent plan of adoption for the children.  The children remained placed in the home of the same resource family since June 14, 2022.  At six years of age, both children had no noted health concerns, and they were developing on target for their ages.  Both children were receiving mental health services to learn coping skills and express their feelings.  The children's care providers were committed to providing a permanent plan of adoption for the children.

The children continued to refuse visits with mother.  Mother had not been able to demonstrate consistent participation in visits with the children due to their refusal for

over a year. The social worker concluded that it would not be detrimental to the children to terminate parental rights. The current care providers were observed to meet the children's needs for security, nurturing, support, and guidance during the social worker's monthly visits.

A continued section 366.26 hearing was held on July 2, 2024. Mother was present and represented by counsel for the hearing. Mother's counsel submitted with comments regarding the children's refusal to visit with mother. Counsel concluded her comments as follows: "It's just concerning that given what's at stake and the orders that are about to be made, that the [d]epartment didn't do its job to ensure that the children have the opportunity to actually see their mother and the changes that she had made, given how much they said they loved and missed her when they were first removed. Submitted."

The juvenile court responded by asking if all the things stated by mother's counsel were subject to litigation at the contested 12-month review hearing in February. Mother's counsel responded, "[t]hat is correct." The juvenile court proceeded to adopt the department's recommendation by terminating the parental rights of mother and father and selecting a plan of adoption for the children. Mother filed a timely notice of appeal.

## DISCUSSION

Mother's only contention on appeal is that reasonable services were not provided to mother because the reunification plan did not include conjoint therapy between the children and mother. The department argues that the doctrines of law of the case and res judicata prevent mother from relitigating the issue of reasonable services.

Under section 366.26, subdivision (*l*), "[a]ll court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 247.) Such orders may not be reviewed on appeal from a later appealable order. (*In re Anthony B.* (1999) 72 Cal.App.4th 1017, 1024 ["[T]he Legislature, by its enactment of section 366.26, subdivision (*l*), sought to outlaw review

29.

by appeal of all decisions made in conjunction with a setting order."].) As the court observed in *In re Diana G.* (1992) 10 Cal.App.4th 1468, 1477–1478, "the findings made [at the 12-month review that] … subsequently formed the basis of the termination ruling … following the section 366.26 permanency planning hearing, have become res judicata."

" 'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. Collateral estoppel, or issue preclusion, 'precludes relitigation of issues argued and decided in prior proceedings.' " (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.) Direct estoppel precludes relitigation of issues based on the prior decision when the second action is on the same claim. (*Sabek, Inc. v. Engelhard Corp.* (1998) 65 Cal.App.4th 992, 997.)

The analysis for direct or collateral estoppel is the same: " ' "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." ' " (*Sabek, Inc. v. Engelhard Corp.*, *supra*, 65 Cal.App.4th at pp. 997–998.)

In the present case, mother had the opportunity to challenge the court's finding that reasonable services were provided at the 12-month review hearing in these same proceedings with the same children. In fact, mother sought an extraordinary writ petition from the order terminating her reunification services. Mother's argument was based in part on the lack of conjoint family therapy between mother and the children. We rejected mother's argument that there was insufficient evidence to support the juvenile court's

30.

finding that reasonable services were provided to her during the review period. Those orders are final now, and mother may not collaterally attack them.

On appeal from the section 366.26 hearing, mother makes the identical argument: that the department's reunification plan was unreasonable because it "inexplicably failed to contain a plan for conjoint therapy between [m]other, [the children], and their therapists." In her reply brief, mother asserts that res judicata may not be applied " ' "if injustice would result or if the public interest requires that relitigation not be foreclosed." ' " (*Consumer Advocacy Group, Inc. v. ExxonMobil Corp.* (2008) 168 Cal.App.4th 675, 686.)

We find mother's argument unpersuasive. To permit additional appellate review of an order finding that reunification services were adequate would only delay dependency proceedings, contrary to the strong public policy against protracted litigation in these cases. (*In re Rebecca H.* (1991) 227 Cal.App.3d 825, 836–837.) In light of the importance of expediting the process where children are placed in a permanent home and minimizing the uncertainties occasioned by such delay, we conclude that the doctrine of res judicata bars mother from relitigating the reasonable services issue on appeal. (*In re Diana G.*, *supra*, 10 Cal. App. 4th at p. 1477–78.)

The department also relies on the law of the case doctrine. (See *Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 435.) Pursuant to the doctrine of law of the case, "when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal …, and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' " (*Kowis v. Howard* (1992) 3 Cal.4th 888, 893.) Moreover, as in the present case, the doctrine applies to a prior writ proceeding, not resulting in a summary denial, but rather where the

31.

review of the matter "necessarily includes a consideration of and ruling upon the merits of the petition." (*Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1260.)

"Thus, the law-of-the-case doctrine 'prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances.'" (*People v. Boyer* (2006) 38 Cal.4th 412, 441.) As mother notes, the doctrine can be disregarded to avoid an unjust decision. (*People v. Shuey* (1975) 13 Cal.3d 835, 841.) Mother contends " 'exceptional circumstances' " allow this court to " 'decide the case without regard to what has gone before.' " (*Searle*, *supra*, 38 Cal.3d at p. 434.) Mother's reply brief states that the present appeal is sought because mother "believes the prior rulings of the trial court and the prior ruling of this [c]ourt were incorrect, and that her parental rights should not be terminated."

For the " 'unjust decision' " exception to apply, however, "there must at least be demonstrated a manifest misapplication of existing principles resulting in substantial injustice." (*People v. Shuey*, *supra*, 13 Cal.3d at p. 846.) The doctrine of law of the case is generally followed "not because the court is without power to reconsider a former determination, but because the orderly processes of judicial procedure require an end to litigation." (*Gore v. Bingaman* (1942) 20 Cal.2d 118, 122–123.)

In our prior opinion, this court affirmed the judgment of the juvenile court from the 12-month review hearing where the court found reasonable services were provided and terminated mother's family reunification services. (*Maria A.*, *supra*, F087643.) On appeal, mother merely reiterates her prior complaints surrounding the absence of conjoint family therapy in her case plan during the reunification period. She provides no valid arguments to support her claim that an erroneous decision resulted in substantial injustice. As stated in our prior decision, the department made extensive efforts to resolve the problems that led to the removal of the children. The subsequent termination of her parental rights is an unfortunate result for mother, however, it cannot be attributed

to the misapplication of existing legal principles in a prior decision.  (*Maria A.*, *supra*, F087643.)

In sum, we conclude the law of the case doctrine is also applicable to mother's appeal.  Neither the application here of res judicata principles or the law of the case doctrine will render an unfair result.  Therefore, we decline to revisit arguments on appeal dealing with the reasonableness of reunification services.  Given mother's failure to address any issues stemming from the section 366.26 hearing, we affirm the juvenile court's order.

## DISPOSITION

The order is affirmed.